OPINION OF THE COURT
Frank P. Geraci, Jr., J.
Defendant, currently serving a term of imprisonment of 25 years to life in a state correctional institution upon his conviction on September 29, 1992, after trial by jury, of murder in the second degree (Penal Law § 125.25), filed this motion pursuant to Criminal Procedure Law § 440.30 (1-a) and the Due Process Clause of the New York State Constitution, seeking an order “directing the Monroe County District Attorney’s Office, Public Safety Laboratory, Medical Examiner’s Office and Sheriff’s Office[1] to conduct a physical search for biological evidence from the above-captioned case and send all such evidence, by whatever procedures deemed necessary for the purposes of maintaining the integrity of the chain of custody, to Dr. Edward Blake of Forensic Science Associates, at 3053 Research Drive, Richmond, California 94806.” Defendant states that such evidence includes but is not specifically limited to: “any slides, swabs, tissue blocks or cultures, hair, fingernail clippings, clothing or shakings from clothing, BB gun parts, or other evidence that may be susceptible to DNA testing.” In the event that such evidence is no longer in the possession of the affected agencies, defendant, alternatively, asks the court to compel such agencies to “produce contemporaneous business records and documents (i.e. copies of log book entries, chain of custody forms, evidence receipts) related to the physical and biological evidence, which was indisputably once in their possession.”
The People submitted an answering affirmation in opposition to the relief sought by the defendant and urge denial of the motion. Thereafter, defendant submitted a reply affirmation which included, inter alia, a request that the mitochondrial DNA (mtDNA) testing of the hair be performed at Mitotyping Technologies, LLC, a private laboratory cited by the People in their answering affirmation as having full accreditation by the American Society of Crime Laboratory Directors/Laboratory Accreditation Board. He continued to strenuously request that short tandem repeat (STR) DNA testing of all other testable *714 items be conducted by Dr. Edward Blake of Forensic Science Associates of Richmond, California. The court permitted the People to serve a responsive affirmation.
Subsequent to receipt of these papers, the court, having learned that the New York State Legislature amended section 440.30 (1-a) of the Criminal Procedure Law, effective July 6, 2004, to provide, inter alia, that, upon motion by the defendant, the court may direct the People to disclose information in their possession concerning the current location of specified evidence and may also issue a subpoena duces tecum directing a public or private hospital, laboratory or other entity to produce the specified evidence or information about its location and status, requested the parties to submit, in writing, their respective positions concerning its applicability to this case. Both parties, by letter submissions, complied with such request.
Prior to the date scheduled for oral arguments, the People filed and served a supplemental answering affirmation wherein they proposed conditions for the testing of the hair only, in the event the court ruled that testing was appropriate in this case. Following oral arguments heard in this matter, the court reserved its decision.
For purposes of rendering a decision, the court has conducted a review of all papers, documentation and exhibits submitted by defendant and the People, the relevant statutory provisions and case law and has considered the arguments and positions of counsel. Moreover, the court has reviewed the history of this case which reflects that the defendant unsuccessfully appealed the instant conviction which he now seeks to vacate (see People v Sterling, 209 AD2d 1006 [4th Dept 1994]), and that, subsequently, his application for leave to appeal to the Court of Appeals was denied (see People v Sterling, 85 NY2d 914 [1995]). The People assert that this case has been *715 and point out that all such courts (excepting the Second Circuit wherein an application is presently pending) have rejected defendant’s various claims. However, this lengthy history notwithstanding, the People acknowledge that the relief sought by the instant motion, i.e., a search for biological evidence and DNA testing of such evidence, was not addressed in any of the motions or applications filed heretofore by the defendant and was never raised on appeal in state court or in any other state or federal court proceedings.
*714 “exhaustively reviewed by the trial judge on post-verdict and post-judgment motions; by the Appellate Division on direct and collateral appeal; by the Court of Appeals on consideration of whether to grant review; by the United States District Court for the Western District of New York in denying a petition for habeas corpus relief; and presently by the United States Court of Appeals for the Second Circuit, which is considering defendant’s application for permission to appeal the denial of habeas corpus,”
*715 At the time the instant motion was filed, CPL 440.30 (1-a) concerning requests for forensic DNA testing provided as follows:
“In cases of convictions occurring before January first, nineteen hundred ninety-six, where the defendant’s motion requests the performance of a forensic DNA test on specified evidence, and upon the court’s determination that any evidence containing deoxyribonucleic acid (‘DNA’) was secured in connection with the trial resulting in the judgment, the court shall grant the application for forensic DNA testing of such evidence upon its determination that if a DNA test had been conducted on such evidence, and if the results had been admitted in the trial resulting in the judgment, there exists a reasonable probability that the verdict would have been more favorable to the defendant.”
Defendant was convicted on September 29, 1992, almost two years before section 440.30 (1-a) was added to the postjudgment statute (see L 1994, ch 737, § 2, eff Aug. 2, 1994). Defendant’s conviction occurred before January 1, 1996, the statutory cutoff date in effect at the time his motion was filed.
During the pendency of this motion, the Legislature amended this provision. The amended statute, effective July 6, 2004, now reads:
“(a) Where the defendant’s motion requests the performance of a forensic DNA test on specified evidence, and upon the court’s determination that any evidence containing deoxyribonucleic acid (‘DNA’) was secured in connection with the trial resulting in the judgment, the court shall grant the application for forensic DNA testing of such evidence upon its determination that if a DNA test had been conducted on such evidence, and if the results had been admitted in the trial resulting in the judgment, *716 there exists a reasonable probability that the verdict would have been more favorable to the defendant.
“(b) In conjunction with the filing of a motion under this subdivision, the court may direct the people to provide the defendant with information in the possession of the people concerning the current physical location of the specified evidence and if the specified evidence no longer exists or the physical location of the specified evidence is unknown, a representation to that effect and information and documentary evidence in the possession of the people concerning the last known physical location of such specified evidence. If there is a finding by the court that the specified evidence no longer exists or the physical location of such specified evidence is unknown, such information in and of itself shall not be a factor from which any inference unfavorable to the people may be drawn by the court in deciding a motion under this section. The court, on motion of the defendant, may also issue a subpoena duces tecum directing a public or private hospital, laboratory or other entity to produce such specified evidence in its possession and/or information and documentary evidence in its possession concerning the location and status of such specified evidence.” (CPL 440.30 [1-a].)
As can be discerned from a fair reading of the amended statute as compared with the former statutory language, the Legislature eliminated the limitation on postconviction motions to vacate in which forensic DNA testing is sought to those convictions occurring prior to January 1, 1996 (CPL 440.30 [1-a] [a]), and included a provision for court-ordered disclosure by the People of the existence and location of specified evidence, as well as for use of the subpoena duces tecum by a defendant, upon motion to the court, to obtain production of specified evidence from hospitals, laboratories and/or other entities in possession of such evidence (CPL 440.30 [1-a] [b]). Unquestionably, the amended statute continued to authorize postjudgment motions seeking forensic DNA testing.
It is also clear that under either the requirements of the former provision or the amended version, the statute contemplates that a defendant, in the first instance, include a request for DNA testing in a postjudgment motion to vacate based upon a ground set forth in CPL 440.10 (1) (a)-(h). Indeed, CPL 440.30 *717 (captioned: “Motion to vacate judgment and to set aside sentence; procedure”) sets forth the procedural requirements for such motions, as well as the criteria to be applied by a court determining whether to grant or deny such applications. Defendant’s motion, styled and framed only as a motion for discovery of DNA evidence in the possession of the People and other entities and for DNA testing, fails to articulate any ground enumerated in CPL 440.10 as a basis for bringing the motion. Since he does claim that the results of DNA testing should be considered “newly discovered evidence,” the court will consider the issues presented (see CPL 440.10 [1] [g]).[2]
According to a noted commentator, when CPL 440.30 (1-a) was added in 1994, it represented an apparent legislative determination that until January 1, 1996, DNA evidence is to be deemed evidence “which could not have been produced by the defendant at the trial even with due diligence on his part” (Preiser, 1994 Supp Practice Commentaries, McKinney’s Cons Laws of NY, Book 11 A, CPL 440.30, 2004 Pocket Part, at 310, quoting CPL 440.10 [1] [g]). Despite this scholarly interpretation, the requirement of due diligence, nonetheless, has been held to apply in certain situations (see People v Kellar, 218 AD2d 406 [1996], lv dismissed 89 NY2d 948 [1997]; CPL 440.10 [1] [g]). In Kellar, the issue before the appellate court was whether defendant’s request for DNA testing pursuant to CPL 440.30 (1-a) should have been granted by County Court, notwithstanding a prior determination on an earlier appeal that defendant’s postjudgment motion based upon allegations of “newly discovered evidence” (CPL 440.10 [1] [g]) had been properly denied because the defendant was fully aware of the presence of sperm and the possibility of DNA testing, and its use was explored by him and his counsel prior to trial. Affirming the denial of the motion for DNA testing, the Court stated,
“We do not read CPL 440.30 (1-a) as granting a second opportunity to those who have failed to take *718 advantage of available DNA testing prior to trial . . . [and] conclude that in enacting CPL 440.30 (1-a), the Legislature did not intend to abrogate the ‘due diligence’ requirement with regard to this one species of newly discovered evidence (CPL 440.10 [1] [g])” (People v Kellar, 218 AD2d 406, 410 [1996], lv dismissed 89 NY2d 948 [1997]).
With respect to the issue of the timeliness of the instant application, filed almost 10 years after CPL 440.30 (1-a) initially took effect, defendant contends that the statute contains no requirement for the exercise of due diligence in the bringing of such motions, and, therefore, has provided no reason(s) for the delay in bringing his motion and has set forth no information which demonstrates the exercise of due diligence on his part. The People, on the other hand, argue that the defendant could have brought his motion for DNA testing at an earlier time, i.e., at any time within the last 13 years. More specifically, they contend that the defendant could have raised such issues at least eight years ago when he brought a motion seeking post-judgment relief on or about December 30, 1996 in Monroe County Supreme Court where, upon his motion to vacate his murder conviction on the ground of newly discovered evidence, that court conducted a three-day hearing on the issues raised therein, all of which related to defendant’s theory that someone else, namely, Mark Christie, shot and beat to death the victim, 74-year-old Viola Manville, sometime between the hours of 2:00 a.m. and 4:30 p.m. on November 29, 1989. Defendant has acknowledged that, during such hearing, he produced several of Mark Christie’s friends and acquaintances as witnesses who described his confessions to the Manville murder and his participation in other violent acts. According to defendant, these same witnesses also put into question Mark Christie’s alibi for the time of the Manville murder. After duly considering the evidence adduced at the hearing, Supreme Court Justice Wisner denied defendant’s request to vacate his conviction. The Appellate Division, Fourth Department, affirmed Justice Wisner’s decision denying the motion, and leave to appeal to the Court of Appeals was thereafter denied (People v Sterling, 267 AD2d 1053 [4th Dept 1999], lv denied 94 NY2d 907 [2000]).
Asserting that the People misperceive the concept of newly discovered evidence by equating it with the physical evidence itself and not the results of DNA testing, the defendant cites People v Wise (194 Misc 2d 481 [2002]). However, in People v *719 Wise, the court, when deciding a motion brought by defendants convicted in 1990 of raping a Central Park female jogger to vacate judgment on the ground of newly discovered evidence, determined that the newly discovered evidence consisting not only of the real perpetrator’s statements to law enforcement officials in 2002 that he alone committed the rape and other crimes concerning the jogger, but his DNA matching the DNA found on the sock at the crime scene and that found on the cervical swab taken from the victim, was not available at trial and could not have been discovered with due diligence because it did not exist until 2002.
While it would have been consistent with his premise that Mark Christie or some other person committed this heinous crime for defendant to have sought DNA testing of biological evidence at the time he filed the prior postjudgment motion, it is clear that, at that time, the defendant made no request to compel the People to preserve any evidence secured during the investigation which might have contained DNA evidence, nor did he move for relief pursuant to CPL 440.30 (1-a). Defendant does not deny that he was aware as early as before trial that certain biological evidence consisting of hair, blood, fingernail scrapings, etc., existed.
In this regard, this court, as did the Court in Kellar, notes that while CPL 440.30 (1-a) was added to that section of article 440 which sets forth the procedures to be followed in connection with a motion to vacate a judgment, its addition did not change the actual grounds for such motion as set forth in CPL 440.10 (1). CPL 440.10 (1) (g), in fact, does contain the additional requirement that a motion based upon the ground of newly discovered evidence must be made with due diligence after its discovery.
In any event, although defendant does not specifically state that he was not in a position earlier to raise the issue of DNA testing, he does assert that “[s]ince the time of the investigation of Mrs. Manville’s murder and the denial of Sterling’s post-trial motion, a revolution in science and law enforcement has taken place.” A fair reading of the supportive documentation appended to defendant’s motion[3] reveals that in the decade following 1986, the year in which DNA evidence first was introduced in a United States court, DNA evidence has become *720 “the foremost forensic technique for identifying perpetrators, and eliminating suspects, when biological tissues such as saliva, skin, blood, hair, or semen are left at a crime scene.” It is also a fair statement that the Court of Appeals in People v Wesley (83 NY2d 417, 424 [1994]), wherein the issue concerned the admissibility of DNA profiling evidence in New York State, determined that “DNA profiling evidence is generally accepted as reliable by the relevant scientific community and was so accepted at the time of the Frye hearing in 1988.” Subsequent to Wesley, but later in 1994, the New York State Legislature enacted CPL 440.30 (1-a) as a component of legislation, the goals of which were (1) to regulate the quality of state and local government forensic laboratories and forensic DNA laboratories by creating an administrative mechanism for establishing minimum scientific standards for conducting forensic analyses, as well as for monitoring and accrediting the laboratories which perform them, and (2) to provide for a data bank (DNA identification index) to record and store the DNA characteristics of specific criminal offenders convicted after January 1, 1996 for future identification purposes (Preiser, 1994 Supp Practice Commentaries, McKinney’s Cons Laws of NY, Book 11 A, CPL 440.30, 2004 Pocket Part, at 310).
It is not disputed that the primary technique for DNA testing at the time the Court of Appeals decided Wesley was Restriction Fragment Length Polymorphism (RFLP) and analysis, a technique which the defendant does not seek to utilize in the performance of DNA testing requested in this case. Instead, he seeks mtDNA testing of a hair (shaft with no root attached) found in the victim’s hand and STR DNA testing of the victim’s clothing, vaginal swabs, fingernail scrapings, and/or pieces of the bloodstained BB gun. Both techniques, according to the defendant, are newer, more sensitive forms of DNA testing developed since 1992, which could provide the definitive answer as to who murdered Mrs. Manville. Defendant asserts that “STR DNA testing is now the standard DNA test, used by the federal government and all fifty states to operate the national and local DNA databanks — it was selected because of the government’s expectation that it is sufficiently sensitive and robust to remain the standard technology for many years in the future.” Additionally, he states that the FBI began utilizing mtDNA testing in 1996, and, in 1999, the first American criminal court case admitted mtDNA test results (State v Ware, 1999 WL 233592, 1999 Tenn Grim App LEXIS 370 [Apr. 20, 1999]). Although the *721 People state that, by 1996, both techniques sought to be used by the defendant were well-accepted in the scientific community as reliable, they acknowledge that the Polymerase Chain Reaction (PCR)-based STR DNA was recognized as such by an American court in 1997 (Commonwealth v Rosier, 425 Mass 807, 685 NE2d 739 [1997]), and that mtDNA evidence was accepted as being reliable by a New York court in People v Klinger (185 Misc 2d 574 [2000]), a case decided in 2000.
It is evident that profound and far-reaching advances in this area of science have occurred relatively quickly. The court finds that recent developments surrounding the use of DNA testing as a reliable forensic technique for identifying perpetrators and eliminating suspects in instances where biological evidence is detected, and its acceptance as such by the courts of this state, provide a sufficient basis for the delay in this case.
Defendant rests his request for forensic DNA testing upon two legal theories. First, he asserts that the very purpose of CPL 440.30 (1-a) is “to use advanced scientific technology to test the State’s identification proof — proof that a jury has already determined to be beyond a reasonable doubt — to determine if a wrongful conviction has occurred.” Second, he contends that, notwithstanding the absence of a statutory right to postconviction discovery, the Due Process Clause of the New York State Constitution “has been interpreted to require prosecutors to disclose exculpatory evidence after conviction” (see e.g. Matter of Dabbs v Vergari, 149 Mise 2d 844 [1990]). A corollary of defendant’s position emerged during oral arguments: if testable material exists, it should be tested.
Addressing first defendant’s due process argument, it is well settled that there is no constitutional right to discovery (Weatherford v Bursey, 429 US 545, 559 [1977]). Discovery in a criminal proceeding is governed entirely by statute (Matter of Washpon v New York State Dist. Attorney, Kings County, 164 Misc 2d 991, 993 [1995], citing People v Copicotto, 50 NY2d 222, 225 [1980]; CPL art 240). In Matter of Dabbs v Vergari (149 Misc 2d 844, 847 [1990]), a case upon which defendant primarily relies, after acknowledging the absence of any statutory right to postconviction discovery, the court reasoned that the fundamental due process right to a fair trial entitled a defendant to the postconviction discovery of exculpatory evidence (citing generally Brady v Maryland, 373 US 83 [1963]; People v Robinson, 133 AD2d 859 [1987]), so long as the threshold requirement of materiality was met, i.e., that “there is a rea *722 sonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A ‘reasonable probability’ is a probability sufficient to undermine confidence in the outcome” (Dabbs at 847, quoting United States v Bagley, 473 US 667, 682 [1985]; People v Chin, 67 NY2d 22, 33 [1986]).
Matter of Dabbs v Vergari, decided almost four years prior to the addition of CPL 440.30 (1-a) to the postjudgment relief provisions of article 440 of the Criminal Procedure Law, clearly based its ultimate determination, the granting of an order directing testing of certain items containing DNA evidence, upon the establishment by the defendant of a reasonable probability that a different result would have obtained had disclosure been made to the defense. In that case, the court opined that the victim’s panties, a gauze pad and rape test slides had “high exculpatory potential,” since, assuming the truth of the victim’s sexual history, i.e., her testimony that she had no sexual relations with anyone else for at least 24 hours prior to the attack, any semen taken from the victim could only belong to her attacker (Matter of Dabbs v Vergari, 149 Misc 2d 844, 849 [1990]). Under such circumstances, exclusion by DNA test results of the defendant as the depositor of the semen would have strongly impeached the credibility of the victim’s identification of the defendant (id.).
When recently amending CPL 440.30 (1-a), the Legislature made no change in the standard originally articulated for obtaining an order granting an application for DNA testing: a court must make a determination that if a DNA test had been conducted on such evidence, and if the results had been admitted in the trial resulting in the judgment, a reasonable probability exists that the verdict would have been more favorable to the defendant. The criterion utilized by the court in Matter of Dabbs v Vergari is not inconsistent.
Thus, considering that the Legislature elected to adhere to the “reasonable probability” standard and gave no indication that it intended CPL 440.30 (1-a) to function as a broad discovery or investigative tool unconnected to a motion for post-judgment relief, any argument that it is the mere existence of testable items containing DNA evidence which serves as the sole criterion, which applications for DNA testing must meet, is without merit. The defendant’s contention, that if there is testable material it should be tested, is not supported by a review of the statute or analysis of the legislative intent. If the legislators *723 intended CPL 440.30 (1-a) to be a general discovery statute, they could have simply stated such. Therefore, without question, the defendant must establish a reasonable nexus between the testable items, the particular facts and circumstances surrounding his conviction and how DNA testing of such items would have produced a more favorable result at trial.
Previously, courts have held that it is incumbent upon a defendant to demonstrate first that the evidence to be tested “still exists and is available in quantities sufficient to make testing feasible at this late date” and, moreover, the People are under no obligation to preserve trial evidence after defendant’s direct appeals have been exhausted (see People v Barnwell, 6 AD3d 1147, 1147-1148 [4th Dept 2004], quoting People v Ahlers, 285 AD2d 664, 665 [2001], lv denied 97 NY2d 701 [2002]; Matter of Washpon v New York State Dist. Attorney, Kings County, 164 Misc 2d 991, 997 [1995]). With respect to the existence of the evidence sought to be tested, defendant posits that “[w]hen properly documented, collected, and stored, biological evidence can be analyzed to produce a reliable DNA profile years, even decades, after it is collected” (see US Dept of Justice, Off of Justice Programs, Natl Inst of Justice, Using DNA to Solve Cold Cases, NCJ 194197, at 3 [July 2002]). In view of the recent amendment to CPL 440.30 (1-a) and the People’s acknowledgment that all items in their possession already have been inventoried (a tacit admission that some items, though unparticularized at this juncture, do in fact exist), compliance with the statute is appropriately in order in this case.
The question remains whether defendant has demonstrated a reasonable probability that a more favorable verdict would have resulted from the introduction of the DNA testing evidence at trial (see e.g. People v Keene, 4 AD3d 536, 536-537 [2004]). According to the defendant, forensic DNA testing of any slides, swabs, tissue blocks or cultures, hair, fingernail clippings, clothing or shakings from clothing, BB gun parts or other evidence susceptible to DNA testing would reveal that someone else murdered the victim. He contends that no physical evidence or witness connects him to the murder of Mrs. Manville. In this regard, he states that only his confession, which he later repudiated, and the testimony of his ex-girlfriend’s mother recounting defendant’s statements that “he was sorry, it was an accident, he didn’t mean it,” connect him to this murder. He further states that 25% of all cases in which DNA tests have been conducted and resulted in the exoneration of convicted defen *724 dants involved false confessions. However, defendant would have this court overlook the fact that his confession contained not only certain details verified by the police, but included significant details which the police never released to the public during the investigation — a description of the jacket worn by the victim at the time she was murdered and the fact that she had been shot. Moreover, defendant’s allegations that he was improperly subjected to hypnosis and suggestive police tactics before he confessed have been considered and rejected previously on direct appeal (People v Sterling, 209 AD2d 1006 [1994], lv denied 85 NY2d 914 [1995]). Furthermore, despite his extensive efforts to portray Mark Christie as the real killer, the evidence of such theory as presented in the postverdict motion in 1992, as well as during the hearing held in connection with the postjudgment motion filed in 1996, has been determined to be lacking credibility and fails to provide credible support for defendant’s claim that he falsely confessed to police investigators.
Turning to the items sought to be tested, defendant has not alleged that the blood found on the victim’s clothing, the BB gun parts, or any other item secured in connection with the trial, was determined to be from someone other than the victim. The defendant does not dispute that the amount of blood found on the victim’s clothing and other items located at the scene appear to be consistent with evidence of the severity of the beating inflicted on her and having been shot twice in the head. According to the People, and the defendant does not dispute this assertion, no fingerprints were detected on any of the BB gun parts located at the scene. There is no allegation of any other type of biological evidence on these items.
With respect to the swabs, defendant posits that the circumstances, and the condition in which the victim’s body was discovered, suggest a killer matching a certain profile — one who may have attempted to sexually assault the victim, and/or merely ejaculated on her before or after removing her pants and underwear. The defendant has not pointed to one scintilla of evidence in the record which supports the view that a sexual assault occurred or was even attempted. Nor does the defendant point to any evidence which suggests that ejaculation or penetration occurred. The report of the Monroe County Medical Examiner, attached as an exhibit to defendant’s motion papers, contains no medical evidence that the victim had been raped and specifically indicates that no spermatozoa were determined *725 to be present, in any event. Indeed, the toxicology report states that the oral, rectal and vaginal swabs all tested negative for acid phosphatase — an enzyme found in semen. As such, then, defendant’s stated reason for testing the swabs amounts to nothing more than speculation.
As regard fingernail scrapings, there is no indication from the medical examiner’s report that any were obtained during the autopsy. Additionally, the People also state that none were taken.
Under these circumstances, the defendant has failed to demonstrate that a reasonable probability exists that a more favorable outcome at trial would have been forthcoming had the results of any DNA testing of the aforementioned items been introduced at his trial (see People v Dearstyne, 305 AD2d 850 [2003]). The request for DNA testing of any of these items, therefore, is denied.
The remaining item for which mitochondrial testing is requested is the gray to white, rootless hair shaft discovered in the victim’s left hand on the autopsy table. Testimony during the trial revealed that the victim’s left hand was bagged at the scene and the bag was removed at the time autopsy procedures were performed by the medical examiner’s staff. Issues regarding this hair were raised and contested during the trial without resolution as to whom the hair belonged. Defendant alleges that such hair could have come from Mark Christie, a dirty blonde who was 16 years old at the time of the murder. The People allege that it could have come from any number of sources, none relevant to the murder. It is conceded that microscopic testing of the hair discovered in this manner was inconclusive and the source of the hair could not be narrowed exclusively to one person. Mitochondrial testing of this type of DNA evidence has been recognized in this state only since the year 2000 (see People v Klinger, 185 Misc 2d 574 [2000]).
In light of the People’s concession that forensic DNA testing of this hair might prove helpful and their stated willingness to assist the defense in obtaining an appropriate DNA sample from Mark Christie or a member of his maternal bloodline, testing of the hair, then, should occur. In his reply, defendant agreed to mitochondrial testing of the hair at Mitotyping Technologies, LLC, an accredited private laboratory in Pennsylvania which the People included on their listing of approved facilities. Therefore, testing of the hair shall take place at such facility or following a protocol agreed upon by the parties. The protocol set forth in the People’s papers appears to be sufficient for this *726 purpose. However, if the parties cannot come to an agreement as to the protocol to be followed, they may apply to the court for direction.
The remaining issue concerns who assumes the responsibility for payment of the costs associated with DNA testing of the hair. The People insist that neither the Monroe County District Attorney’s Office nor the County of Monroe should be ordered to pay for testing, given that the defendant has been represented by private counsel throughout and is currently receiving legal assistance through the Innocence Project. Although the defense alleges that counsel is representing the defendant pro bono and the defendant appears to be indigent, at this time, there is before the court no request pursuant to the relevant County Law provisions to consider the indigence of this defendant in making the determination as to payment of testing expenses. Therefore, the court finds that any costs for testing of the hair are the responsibility of the defendant.
The motion to vacate the defendant’s conviction is hereby denied. Such motion may, however, be renewed based upon the results of DNA testing on the hair sample.
To summarize, the following relief is hereby being ordered by the court at this time:
(1) The People shall supply the defendant an inventory of all items containing biological evidence in their possession as set forth in CPL 440.30 (1-a) (b);
(2) Testing of all items, except the hair, is denied based upon defendant’s failure to meet his burden of demonstrating that a reasonable probability exists that the verdict would have been more favorable had such items been subjected to DNA testing and had the results been admitted at trial;
(3) Testing of the hair by mtDNA tests shall be conducted at Mitotypying Technologies, LLC, or under a protocol agreed to by the parties;
(4) If the parties cannot agree to a protocol for testing, they may return to the court for direction;
(5) The defendant shall be responsible for payment of any expenses associated with the testing of the hair; and
(6) The motion to vacate defendant’s conviction is denied, subject to renewal of said motion based upon the results of DNA testing.

. Only the Monroe County District Attorney’s Office has responded to this motion. The defendant has presented no proof that these other agencies are within the People’s control and has offered no proof of service of the motion papers upon them or their respective legal representatives.

. CPL 440.10 (1) (g) provides: “At any time after the entry of a judgment, the court in which it was entered may, upon motion of the defendant, vacate such judgment upon the ground that: . . . [n]ew evidence has been discovered since the entry of a judgment based upon a verdict of guilty after trial, which could not have been produced by the defendant at the trial even with due diligence on his part and which is of such character as to create a probability that had such evidence been received at the trial the verdict would have been more favorable to the defendant; provided that a motion based upon such ground must be made with due diligence after the discovery of such alleged new evidence.”

. See, exhibit H — US Dept of Justice, Off of Justice Programs, Natl Inst of Justice, Postconviction DNA Testing: Recommendations for Handling Requests, NCJ 177626 (Sept. 1999).