[No. C062760. Third Dist. Sept. 18, 2012.]

THE PEOPLE, Plaintiff and Respondent, v.
EDDIE DUANE STEVEY, Defendant and Appellant.

COUNSEL

Diane E. Berley, under appointment by the Court of Appeal, for Defendant and Appellant.

Edmund G. Brown, Jr., Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Stephen G. Herndon and Paul E. O'Connor, Deputy Attorneys General, for Plaintiff and Respondent.

OPINION

RAYE, P. J.—Defendant Eddie Duane Stevey, convicted of various sex crimes against his 16-year-old victim, contends the interpretation of the

mixed DNA samples and the methodology used to project the probability of a DNA match constitute "new scientific technique[s]" requiring an evidentiary hearing to demonstrate they are generally accepted in the scientific community. (*People v. Kelly* (1976) 17 Cal.3d 24, 30 [130 Cal.Rptr. 144, 549 P.2d 1240] (*Kelly*).) In fact, it has been over 20 years since the first California appellate court concluded that the use of DNA for forensic purposes was generally accepted within the scientific community, and there has been a steady stream of cases finding general acceptance of an ever-increasing number of kits and improved methodologies in collecting and analyzing DNA evidence. (E.g., *People v. Axell* (1991) 235 Cal.App.3d 836, 842 [1 Cal.Rptr.2d 411] (*Axell*); *People v. Hill* (2001) 89 Cal.App.4th 48, 56 [107 Cal.Rptr.2d 110] (*Hill*); *People v. Jackson* (2008) 163 Cal.App.4th 313, 325 [77 Cal.Rptr.3d 474] (*Jackson*).)

Here, the prosecution offered no new science, no breakthrough technology, and no untested kits or tests. No defense expert disputed the efficacy of the interpretive methodologies used at trial; no studies exposed any flaws in the analytical methods used by the county criminalists; and no cases were cited in which the methodologies were discredited within the scientific community. We affirm the trial court's determination that the prosecution did not offer the type of new scientific technique that necessitates a *Kelly* prong-one evidentiary hearing.

## FACTS

In May 2007 K.E., a 16-year-old junior in high school, lived with her mother, who was in and out of prison for various drug offenses. K.E. was a decent student, played a musical instrument in the school orchestra, was a member of the California Cadet Corps, and tried hard to please her mother. Yet she also stole from her godmother, was afraid of her mother, smoked cigarettes and marijuana, had sexual intercourse with a neighbor boy, Michael, shortly before the crimes alleged here, and lied that she had never had sex with anyone before defendant.

Defendant had lived with K.E. and her mother in 2005 and 2006. K.E. confided in defendant as a good friend, sharing information with him about smoking, drugs, and sex that she would never discuss with her mother. She told defendant she had sex with Michael. Since defendant then lived just down the street, he continued to visit regularly even after moving out of K.E.'s house.

On the evening of Sunday, May 6, 2007, defendant was out with his girlfriend and was drinking. His girlfriend complained about his sexual performance. On their way home, defendant got out of the car and began socializing

with K.E.'s mother and her friends. Eventually, he and K.E.'s mother shared "a line" of methamphetamine in her bedroom. Defendant left the house when K.E.'s mother decided to visit another friend.

K.E. testified that defendant knocked on her bedroom window sometime between 10:30 and 11:30 p.m. and asked her to let him in. When she went to the door to the patio, she found him already in the living room. She asked defendant where her mother was and told him he should not be in the house when her mother was not. He followed her into her bedroom and told her, "this is a golden opportunity." He engaged in multiple sex acts over several hours in an apparently futile attempt to get an erection and ejaculate.

According to K.E., he began by pulling down her pajama bottoms and panties and orally copulating her on her bed. He asked her to suck his penis, but she refused. He sucked and licked her breasts before pulling her to the floor. There, he digitally penetrated her vagina while masturbating. He held a candle near her vagina and told her how "good [it] tasted" and how beautiful her "pussy" was. Sporadically, he would penetrate her vagina with his penis, but because he could not achieve an erection, he would return to masturbation. At some point, he asked K.E. to get him some lotion.

By then K.E. had heard her mother return home, but she was too embarrassed and ashamed to tell her mother what was happening in her bedroom. She retrieved cocoa butter lotion from the living room, may have gone into the bathroom, and returned to her bedroom where, she told the jury, defendant continued to masturbate with the lotion. Although defendant would not allow her to dress or go to bed for several hours, eventually she got into bed and fell asleep. He woke her up to let him crawl through her window. There was a spa with a cover under her window. The police found that the spa cover had disturbed dust on it as if someone had climbed over it.

K.E. went to school the next day without taking a shower or changing her panties. She told two friends at school what had happened. That evening, she told her brother's girlfriend, who immediately told K.E.'s mother; her mother called the police. K.E. went across the street to visit Michael until the police arrived. She gave a lengthy statement to the officers and denied she had ever had sexual intercourse with anyone before defendant penetrated her.

The police took K.E. to the UC Davis Medical Center for a sexual assault examination. A nurse practitioner collected blond hairs from K.E.'s vagina and cervix, four swabs from her vagina, blood and urine samples, and potential saliva from her breasts. Pubic hairs and a buccal swab reference sample were collected from defendant and Michael.

K.E.'s mother testified that she never saw defendant in the house after she returned from visiting her friend, and she did not hear any noises in K.E.'s room.

*Defendant's Testimony*

Defendant testified, though his testimony was not entirely beneficial to his case. His account is peppered with vulgarities we have no reason to repeat. Nor was he much of an historian since he does not wear a watch and admitted that he has no sense of time. And while insisting that he is no snitch and did not tell the police that K.E.'s brother and his friends had beaten and seriously injured him, he volunteered to the police that his son used and sold drugs. Realizing his testimony and behavior were not helpful, he apologized to the judge for his behavior in court.

Nevertheless, defendant insisted that he did not, and would not, have any sexual contact with a minor. He admitted he was under the influence of drugs and alcohol and could not remember everything, but he knew he would never have sex with a minor because he had been molested by a babysitter when he was a boy.

Defendant denied going back to K.E.'s house at all. He claimed she fabricated the allegations because he had discovered her with Michael in the carport near a "1900 fire stove, wood stove," and he had threatened to tell her mother. Defendant had overheard K.E. telling defendant's son that she had lost her virginity to Michael, someone defendant did not like. He testified that after talking to K.E., he went home and did not go out again that evening.

*DNA Evidence*

DNA testing results in a genetic profile of a person, and when the DNA profile of a crime suspect matches the DNA profile derived from the crime scene, criminalists calculate the probability that anyone else's DNA profile would have matched the DNA profile from the crime scene sample. Several criminalists employed by the Sacramento County District Attorney's Crime Lab (county crime lab) testified for the prosecution about the collection, methodology, and interpretation of the DNA testing done on the samples collected from K.E., Michael, and defendant. Some of the results of the testing benefitted the defense; others corroborated K.E.'s account of what defendant had done to her.

The DNA testing of the sperm fraction taken from K.E.'s panties excluded defendant and was consistent with K.E.'s sexual partner, Michael. The DNA results from the labia swab showed a full profile consistent only with K.E.

Yet the results of the DNA testing of the pubic hairs corroborate K.E.'s testimony that defendant had penetrated her vagina as alleged in count one of the information. The results of the DNA testing of the breast swab corroborate her testimony that defendant had sucked her breasts as alleged in count four. Defendant contends that neither the criminalist's probability analysis of the pubic hair testing nor another criminalist's interpretation of the mixed DNA samples taken from the victim's breasts was generally accepted in the scientific community.

*Pubic Hairs*

We begin with the testimony regarding the pubic hairs. Preliminarily we note that it did not take sophisticated DNA testing to confirm that the pubic hairs were blond. Defendant's pubic hairs were blond; neither Michael's nor K.E.'s were.

Prosecution criminalist Angelynn Shaw performed STR (short tandem repeat) and Y-STR DNA analysis on the pubic hairs. Y-STR's are found only on the Y chromosome; thus, they only appear in males. Because the Y-STR testing ignores the female DNA that often overwhelms the male DNA, it is a helpful method when the sample contains a mixture of both male and female DNA. Unlike other kinds of DNA testing, however, it is not possible to identify a particular individual because a male inherits the DNA type from his father and shares the same type with male siblings, uncles, and cousins. According to Shaw, Y-STR testing is generally accepted in the scientific community and is commonly done in labs in the United States and internationally. Y-STR analysis involves the same instruments, the same software, and the same methodology as STR DNA analysis, including isolation (also called extraction), quantitation, amplification, and typing.

While the scientific testing is the same in STR and Y-STR analyses, the interpretation of the value of the results based on the probability of a match differs. Experts employ various statistical methods, depending in part on whether the individual alleles within each locus are statistically independent from one another. With STR results, an analyst uses the "product rule," whereby the frequencies with which each measured allele appears at each tested locus are multiplied together " 'to generate a probability statistic reflecting the overall frequency of the complete multilocus profile.' " (*People v. Nelson* (2008) 43 Cal.4th 1242, 1259 [78 Cal.Rptr.3d 69, 185 P.3d 49] (*Nelson*), quoting *People v. Soto* (1999) 21 Cal.4th 512, 525 [88 Cal.Rptr.2d 34, 981 P.2d 958] (*Soto*).) The product rule cannot be used to calculate the probability of a match with the results of a Y-STR analysis, however, because the traits are not inherited independently. Thus, Shaw testified that she used a simple and well-accepted counting method to determine the frequency of the profile.

With Y-STR results, analysts simply count the number of times the profile appears in a database of males to come up with a frequency. This method has been used for years. Shaw used the U.S. Y-STR Database managed by the National Center for Forensic Science. Because the database was not large, she applied a statistical calculation referred to as a "confidence interval" as a "conservative way of giving an estimate of how often you'll see that haplotype in a population, given how many males are actually in the database, since we can't test the entire population and may have a small sample."

Shaw performed STR analysis using the Identifiler kit and Y-STR analysis using the Yfiler kit on three pubic hairs. She was able to obtain a complete profile using the Yfiler but was only able to obtain allele calls at a few locations using the Identifiler because there was more female DNA present than male. Applying the product rule to the STR analysis, the random match probability was one in 562 for Caucasians. The profile produced from the Yfiler was the same as defendant's sample Y profile. Using the counting method and applying the confidence interval, the probability increased to one in 539 individuals.

*Breast Swab*

Jeffrey Herbert, a criminalist from the county crime lab, explained the DNA testing and results obtained from the right breast swab. He provided a basic primer on DNA testing for the jury, noting the four steps in the DNA analysis process: extraction, quantitation, amplification, and typing. In the first step, DNA is extracted from cells. In cases where female and male DNA are mixed in the sample, chemicals are used to separate the two. Once the quantity of DNA is determined, select regions of the DNA, referred to as genetic markers, are amplified to make more copies of the DNA for analysis. The markers targeted for forensic analysis are STR's. These are locations (loci) where a short segment of the genetic code repeats itself. The number of repeats at specified locations varies among individuals and becomes the basis for distinguishing between them. Each person's DNA contains two copies of these markers—one copy inherited from the father and one from the mother. Variations between them in the number of repeats are referred to as alleles. Thus, for example, an STR marker inherited from the mother might have 10 repeats while the marker inherited from the father has 15; each marker is an allele. Fifteen locations are targeted for amplification.

Following amplification, the last phase of DNA testing—typing—takes place. Fluorescent tags are added to the DNA. The sample is run through an instrument that produces an electropherogram. An electropherogram produces

a graphical representation of the DNA, including the number of repeats in STR alleles. Electropherograms, produced during typing, display peaks. The higher the peak, the more DNA is present at a specific location. The height of the peaks is measured as relative fluorescence units (RFU). If the peak reaches a certain height, the criminalist identifies it as an allele with a numerical designation indicating the number of repeats. The peaks on the electropherogram represent an allele. There are two alleles at each locus. The allele is classified by the number of repeats.

Labs set protocols to ensure the integrity of the DNA profile. Herbert explained that in a sample there are real peaks representing alleles, but there may also be noise from the electricity used in producing the electropherogram and artifacts, that is, miscellaneous matter that is not DNA. If, therefore, the height of a peak is below 75 RFU, the protocol of the county crime lab is to not identify the peak as an allele. The peaks below 75 RFU might represent a very low amount of DNA, or they might represent noise or artifacts.

The swab taken from K.E.'s right breast was from a single source, but it did not produce a complete profile because there were a number of markers below the 75 RFU threshold. The sample may have degraded or some of the markers may have been inhibited by external factors. As a consequence, Herbert testified the partial profile was of 10 out of 15 loci. All 10 of the alleles were the same as those of defendant. Some of the 10 were also shared by K.E. or Michael or both.

Herbert determined that the partial profile occurred at random among unrelated people at the probability of one in 100 billion in the Caucasian population, one in six trillion in the African-American population, and one in 450 billion in the Hispanic population. The prosecutor asked Herbert to recalculate the probability by subtracting the alleles that defendant shared with K.E. and/or Michael. By excluding the shared alleles, the probability that anyone but defendant contributed the DNA was one in 12,000 in the Caucasian population, one in 7,200 in the African-American population, and one in 23,000 in the Hispanic population.

Defendant moved to exclude any testimony involving the interpretation of peak heights produced by the Identifiler kit and the interpretation of mixtures by subtracting genetic profiles based on peak height. After the hearing, the trial court denied the defense motion. Defendant enlarges the scope of his challenges to the admissibility of the DNA evidence on appeal. He contends the trial court erred by failing to have an evidentiary hearing to establish that the interpretations of the DNA test results are generally accepted in the scientific community. (*Kelly, supra,* 17 Cal.3d 24.) But he overlooks something much more basic—*Kelly* only applies to new scientific techniques. We

conclude the interpretation of the test results does not constitute a new scientific technique within the meaning of *Kelly* and did not require an evidentiary hearing.

## DISCUSSION

### Introduction—Scientific Evidence and the *Kelly* Test

 "In *People v. Kelly* (1976) 17 Cal.3d 24 [130 Cal.Rptr. 144, 549 P.2d 1240] . . . , [the California Supreme Court] held that evidence obtained through a new scientific technique may be admitted only after its reliability has been established under a three-pronged test. The first prong requires proof that the technique is generally accepted as reliable in the relevant scientific community. (*Id.* at p. 30.) The second prong requires proof that the witness testifying about the technique and its application is a properly qualified expert on the subject. (*Ibid.*) The third prong requires proof that the person performing the test in the particular case used correct scientific procedures. (*Ibid.*)" (*People v. Bolden* (2002) 29 Cal.4th 515, 544–545 [127 Cal.Rptr.2d 802, 58 P.3d 931] (*Bolden*).) The first and third prongs can be confused; the *Kelly* first-prong analysis applies only to a new technique or procedure, whereas the third prong is case specific. (*People v. Henderson* (2003) 107 Cal.App.4th 769, 786–787 [132 Cal.Rptr.2d 255] (*Henderson*).)

Defendant contends the trial court erred by denying his request for a full evidentiary hearing, under the first *Kelly* prong, to determine whether the Y-STR testing and the methodology used to interpret the results of the DNA testing on mixed samples were generally accepted in the scientific community. Although the science of mathematics may be complicated, "our function is mercifully simple." (*People v. Reilly* (1987) 196 Cal.App.3d 1127, 1148 [242 Cal.Rptr. 496] (*Reilly*).) "With respect to the first prong of this test, 'reliability' means that the technique ' "must be sufficiently established to have gained general acceptance in the particular field in which it belongs." ' (*People v. Kelly, supra*, 17 Cal.3d at p. 30, italics omitted.) In determining whether there has been 'general acceptance,' '[t]he goal is not to decide the actual reliability of the new technique, but simply to determine whether the technique is generally accepted in the relevant scientific community.' [Citation.]" (*People v. Morganti* (1996) 43 Cal.App.4th 643, 656 [50 Cal.Rptr.2d 837] (*Morganti*).)

A finding of "general acceptance" presents a mixed question of law and fact. " '[W]e review the trial court's determination with deference to any and all supportable findings of "historical" fact or credibility, and then decide as a matter of law, based on those assumptions, whether there has been general acceptance.' [Citation.]" (*Morganti, supra*, 43 Cal.App.4th at p. 663.)

■ It has now been over 20 years since DNA evidence was first approved by a California appellate court to prove identity in a criminal case. (*Axell, supra*, 235 Cal.App.3d 836.) "Since then, the scientific methodology, while fundamentally the same, has become more refined and sophisticated." (*Hill, supra*, 89 Cal.App.4th at p. 51.) "California courts have recognized that two methodologies are widely used in forensic DNA testing: restriction fragment length polymorphism (RFLP) and PCR [polymerase chain reaction]. (*People v. Venegas* (1998) 18 Cal.4th 47, 57–58 & fn. 6 [74 Cal.Rptr.2d 262, 954 P.2d 525].) There are three subtypes of PCR testing: DQ-Alpha, which tests a single genetic marker; Polymarker, which tests five genetic markers; and the STR, which tests three or more genetic markers. (*People v. Allen* [(1999)] 72 Cal.App.4th [1093,] 1097 [85 Cal.Rptr.2d 655].) The RFLP and PCR methodologies, including the PCR subtypes, have acquired general acceptance in the scientific community." (*Hill*, at p. 57.) Neither the use of PCR (polymerase chain reaction) nor STR technology to analyze mixed-source forensic samples is a new scientific technique. (*People v. Smith* (2003) 107 Cal.App.4th 646, 665 [132 Cal.Rptr.2d 230] (*Smith*).) Nor are new kits as they come on the market. (*Jackson, supra*, 163 Cal.App.4th at p. 325; *Hill, supra*, 89 Cal.App.4th at pp. 57–58.) What was once considered revolutionary has now become rather mundane, and the question becomes whether the improvement or refinement in DNA methodology qualifies as another breakthrough innovation within the meaning of *Kelly*, or whether the change represents a mere evolution of a generally accepted scientific technique. Here we focus on the methodology used to determine probabilities.

■ DNA is processed to determine if there is a match between a sample derived from the crime scene and a sample taken from the defendant. If so, the probative value of the match depends on its statistical significance. (*People v. Venegas, supra*, 18 Cal.4th at p. 82 (*Venegas*).) "A determination that the DNA profile of an evidentiary sample matches the profile of a suspect establishes that the two profiles are consistent, but the determination would be of little significance if the evidentiary profile also matched that of many or most other human beings." (*Ibid.*) "The question properly addressed by the DNA analysis is therefore this: Given that the suspect's known sample has satisfied the 'match criteria,' what is the probability that a person chosen at random from the relevant population would likewise have a DNA profile matching that of the evidentiary sample?" (*Soto, supra*, 21 Cal.4th at p. 523.) The methods used to compute the probabilities also fall under the *Kelly* prong-one umbrella to determine whether the methodology used is generally accepted in the scientific community. (*Venegas, supra*, 18 Cal.4th at pp. 83–84.)

Once a scientific technique, including probability calculations, is generally accepted, a defendant challenging the technique must offer new evidence. (*Bolden, supra*, 29 Cal.4th at p. 546.) For example, the utilization of the

product rule in a "cold hit" case has been generally accepted by the scientific community and has withstood challenges as a "new scientific technique" when applied in different circumstances. (*Nelson, supra*, 43 Cal.4th at pp. 1263–1264.) With these general principles in mind, we begin with defendant's challenge to the DNA evidence extracted from the pubic hairs inside the victim's vagina.

## I

### Pubic Hairs

DNA testing is tricky when the criminalist, as here, discovers mixed sources in the sample. The DNA evidence extracted from the pubic hairs from inside K.E.'s vagina was introduced as evidence to corroborate her testimony that defendant had sexual intercourse with her as alleged in count one.

■ To address the challenges presented by mixed sources where the female DNA overwhelms the male DNA in the sample taken from the victim, scientists have further refined the PCR/STR testing methodologies to allow for typing of just the male Y chromosome. The specialized typing of the Y chromosome is referred to as Y-STR testing. Although Y-STR testing and its female counterpart, mtDNA (mitochondrial DNA) testing, have been generally accepted by the scientific community as reported by courts across the country, defendant contends the trial court erred by refusing to hold an evidentiary hearing to establish that Y-STR testing is generally accepted. (See, e.g., *State v. Calleia* (App.Div. 2010) 414 N.J. Super. 125, 148–149 [997 A.2d 1051] (*Calleia*), reversed on other grounds in *State v. Calleia* (2011) 206 N.J. 274 [20 A.3d 402]; *Curtis v. State* (Tex.App. 2006) 205 S.W.3d 656, 660–661 (*Curtis*); *State v. Murray* (2008) 285 Kan. 503, 512–514 [174 P.3d 407]; *State v. Lee* (La.Ct.App. 2007) 964 So.2d 967, 983; *Wagner v. State* (2005) 160 Md.App. 531, 547–548 [864 A.2d 1037] (*Wagner*); *People v. Klinger* (N.Y.Sup.Ct. 2000) 185 Misc.2d 574, 580–581 [713 N.Y.S.2d 823] (*Klinger*).) He is mistaken. Y-STR testing does not embrace new scientific techniques. (*Hill, supra*, 89 Cal.App.4th at p. 60.)

"[T]he use of polymerase chain reaction and short tandem repeats technology to analyze a mixed-source forensic sample is neither a new or novel technique or methodology." (*Smith, supra*, 107 Cal.App.4th at p. 665; see *Hill, supra*, 89 Cal.App.4th at p. 57; *Venegas, supra*, 18 Cal.4th at pp. 57–58, fn. 6; *People v. Allen, supra*, 72 Cal.App.4th at p. 1097; *People v. Wright* (1998) 62 Cal.App.4th 31, 34 [72 Cal.Rptr.2d 246].) In the absence of California authority directly on point, it is appropriate for us to turn to relevant decisions from other jurisdictions to determine whether Y-STR has achieved consensus

within the scientific community as a reliable type of generally accepted PCR/STR testing. (*Morganti, supra*, 43 Cal.App.4th at p. 663; *Reilly, supra*, 196 Cal.App.3d at p. 1135.)

Recent cases in New Jersey and Washington are particularly helpful in understanding the basic science, the similarity between PCR/STR and Y-STR testing, and the scientific response to Y-STR testing. In *Calleia, supra*, 997 A.2d 1051, the court explained: "The analytical procedure followed in Y[-]STR DNA testing is identical to that followed in autosomal STR DNA testing. The sample is extracted in the same manner, amplified by the PCR method, tagged with a primer, and detected in the genetic analyzer. The data is collected and represented in exactly the same way. The only procedural distinction is that the primer included in the test kit for Y[-]STR DNA analysis contains markers for the Y[-]STR loci specified by SWGDAM [(a scientific advisory board)]; the primer included in the test kit for autosomal STR DNA analysis contains markers for loci on all twenty-three chromosome pairs. The major difference between autosomal STR DNA analysis and Y[-]STR DNA analysis is in the interpretation and application of the test results." (*Id.* at pp. 1062–1063.)

The similarity between PCR/STR testing and Y-STR testing was also observed in *State v. Bander* (2009) 150 Wn.App. 690 [208 P.3d 1242] (*Bander*). "ReliaGene used a PCR-based process known as YSTR testing to type the DNA samples it tested. YSTR amplification is essentially the same as the PCR-STR process that Frank used, except that it permits the analysis of only male DNA in a mixed-source sample that also contains DNA from a female contributor." (*Id.* at p. 1246.)

Both the strength and the weakness of the Y-STR testing is the fact that only males have the Y chromosome. (*Calleia, supra*, 997 A.2d at p. 1063.) As a result, the Y-STR testing can be used to resolve difficult mixed-source samples by examining the DNA of only the male. The court in *Calleia* further explained Y-STR test's limitations. "Because only males possess Y chromosomes, a mother does not contribute to the genetic code of her son's Y chromosome. The DNA sequence on the Y chromosome is passed in complete form from grandfather, to father, to son and on down the male lineage. The Y chromosome loci are not independent of one another and there is no recombination of DNA. It is strictly a male marker and there is no randomness on the chromosomes. Consequently, the product rule used to generate probabilities for autosomal STR DNA analysis is inapplicable to Y[-]STR DNA analysis. In other words, barring random mutations, all men in a paternal lineage will possess the same Y[-]STR DNA profile. Thus fathers, sons, brothers, uncles, and paternal cousins cannot be distinguished from one another through a Y[-]STR DNA profile. [¶] For this reason, Y[-]STR DNA

testing has limited usefulness in positively identifying an individual. The testing is extremely useful, however, in excluding someone since an individual cannot be the source of the DNA if the profiles do not match. If the Y[-]STR DNA profiles do match, then all that can be said is that the individual *cannot be excluded* as the DNA donor." (*Calleia, supra*, 997 A.2d at pp. 1063–1064.)

The fact that Y-STR DNA testing cannot positively identify an individual does not mean the test is a new technique, that it is unreliable, or that the results are not probative. The *Calleia* court analogized the results of Y-STR testing to conventional forms of evidence routinely admitted in criminal trials, such as shoe imprint evidence. Evidence of shoe imprints found at a crime scene is routinely admitted, the court observed, to connect a criminal defendant with shoes found in his possession, "despite the fact that any number of persons might own identical pairs of shoes." (*Calleia, supra*, 997 A.2d at p. 1066.) The prosecution was not required to prove that the defendant's shoes were the only ones that could have made the impressions; rather, the jury was provided the opportunity to weigh their probative value. In the same way, the probative value of the Y-STR is a question of the weight of the evidence, not its admissibility. (*Id.* at pp. 1066–1067.)

Most importantly for our purposes, it was "established that Y[-]STR DNA analysis is a 'non-experimental, demonstrable technique' that is widely accepted by forensic scientists." (*Calleia, supra*, 997 A.2d at p. 1064.) The court concluded that "there is a general acceptance of Y[-]STR DNA analysis in the scientific community." (*Ibid.*) Similarly, in *Curtis, supra*, 205 S.W.3d 656, the appellate court affirmed the trial court's finding that "the YSTR methodology had been validated 'internally and externally' and subjected to peer review, that it was generally accepted in the scientific community, and that the YSTR evidence was reliable and relevant." (*Id.* at p. 661.)

Defendant cites to no cases in which the reliability of Y-STR testing has been challenged or questioned by members of the scientific community. Nor has he cited any scientific study that questions the validity or the reliability of Y-STR analysis. Belatedly pointing to National Research Council, The Evaluation of Forensic DNA Evidence (1996), he argues that each new PCR system must be individually validated. We will not address his argument in depth for two reasons. First, he forfeited the argument by failing to raise it in the trial court. (*People v. Doolin* (2009) 45 Cal.4th 390, 448 [87 Cal.Rptr.3d 209, 198 P.3d 11] (*Doolin*).) Second, he has not demonstrated that Y-STR is a new PCR system.

 The Y-STR DNA testing has a female counterpart in mtDNA evidence, which has also gained general acceptance within the scientific community. Nuclear DNA and mtDNA are found in human cells, but mtDNA is

found outside the nucleus in the mitochondria. Because eight to 10 chromosomes reside in each mitochondrion, there is a greater quantity of DNA to work with and it is much heartier. (*Klinger, supra,* 185 Misc.2d at p. 577.) However, all mtDNA is inherited from the mother. (*Ibid.*) Unlike nuclear DNA, therefore, all the markers are not independent of each other. Like Y-STR, mtDNA testing is more a test of exclusion than of identification. (*Wagner, supra,* 864 A.2d at p. 1045.) "Because mtDNA is maternally inherited and because all matrilineal decedents will share the same mtDNA, the traditional random match probability used in nuclear DNA analysis cannot be calculated. [Citation.] Instead, the counting method is used, and a ninety-five percent confidence interval is applied." (*Id.* at p. 1045, fn. 9.) The experts in *Klinger, supra,* 713 N.Y.S.2d 823 applied the same statistical methodology. (*Id.* at p. 829.) Thus, "the analyses and interpretations of mtDNA have gained general acceptance in the community of scientists that work in this field." (*Id.* at p. 831.) The principles of mtDNA analysis and the statistical methods, including the counting method and the confidence factor, are generally accepted as reliable in the scientific community. (*Id.* at p. 829.)

■ These cases demonstrate that Y-STR testing, like its female counterpart, mtDNA testing, is not a new scientific technique. It is a further refinement of STR analysis in the continuing evolution of DNA testing for forensic purposes. "Once an appellate court has affirmed in a published opinion a trial court ruling admitting evidence based on a new scientific technique, the precedent may control future trials, at least until new evidence is presented that reflects a change in the scientific community's attitude. (*People v. Venegas, supra,* [18 Cal.4th] at p. 76.)" (*Nelson, supra,* 43 Cal.4th at p. 1257.) The out-of-state cases cited above amply demonstrate that Y-STR testing is generally accepted in the scientific community as a valuable tool in evaluating DNA in mixed-source cases. Moreover, use of the counting method and the confidence factor as a conservative adjustment to the statistical probability of a match is also generally accepted within the scientific community, and in the absence of any case or scientific authority to the contrary, we find no judicial error in allowing the jury to determine the weight of the probability calculations used in this case.

Defendant also belatedly claims the trial court erred by failing to establish that the criminalist used the proper procedures in selecting too small a database in calculating the probability of a match. He forfeited this particular argument by failing to raise it in the trial court. (*Doolin, supra,* 45 Cal.4th at p. 448; *People v. Coleman* (1988) 46 Cal.3d 749, 776–777 [251 Cal.Rptr. 83, 759 P.2d 1260].) Moreover, we find the trial court did not abuse its discretion by relying on Shaw's testimony that she followed correct scientific procedures, that is, that she counted the number of matches within the U.S. Y-STR

Database and applied the confidence factor, a generally accepted method within the scientific community and reported in the out-of-state cases cited above.

## II

### The Breast Swab

The court allowed a second criminalist to testify about the results of the DNA testing of the sample of saliva taken from K.E.'s breast to corroborate K.E.'s testimony that defendant had licked her breast as alleged in count four. Defendant does not contend that the PCR/STR test procedure is a new scientific technique, as that methodology has met the *Kelly* threshold in this state for years. What he does argue is that the interpretation of those results, relying on RFU levels that are not standardized throughout the country, is a new scientific technique that should have been subjected to a *Kelly* prong-one hearing. We disagree and will explain in three steps: presenting the scientific context, debunking the assumption there must be national standards, and illustrating how the methodology used in this case is not a new scientific technique but an application of a widely used and accepted model.

**The Scientific Context**: We explained above that the higher the peak shown on an electropherogram, the more DNA is present. Although the criminalist determined that the breast swab was from a single source, he could only ascertain a partial profile because there was insufficient DNA present at five loci to be identified as alleles. The criminalist opined that the DNA could have been inhibited by external factors (such as dirt, lotion, or a bra rubbing) or the sample may have been degraded. Nevertheless, defendant's DNA matched all 10 of the alleles the criminalist was able to measure.

Defendant, however, challenges the manner in which the criminalist interpreted the results. The county crime lab, as pointed out in the statement of facts, has a protocol requiring a peak height measuring at least 75 RFU's to be identified as an allele and thereby to be used to construct a DNA profile. Thus, the peaks below 75 RFU's were not considered even though, defendant argues, they may have represented DNA matching either Michael or K.E. In essence, defendant contends the lab's artificially high RFU threshold established by the lab's protocol may have excluded exonerating evidence from the jury's consideration. But in any event, defendant maintains the court should have held an evidentiary hearing whereby the prosecution would have had to prove that the criminalist's methodology was generally accepted because his reading of the peaks represents a new scientific technique subject to a *Kelly* threshold showing.

Defendant also argues that the interpretation of the results was flawed by the criminalist's use of a second calculation whereby he excluded all of the alleles defendant shares with either K.E. or Michael or both. He characterizes the exclusion of the shared alleles as a "subtraction" technique that is new to science and again subject to scrutiny in a *Kelly* hearing even though the results of the calculation increased the probability of a match and thereby inured to his benefit.

**National Standards**: Defendant insists a *Kelly* hearing was necessary to determine if the protocol used by the county crime lab fell within generally accepted scientific guidelines or standards. He points out that in reported cases the protocols vary from as low as 40 to as high as 150 RFU's, and in his view, such a swing offends basic principles of due process and equal protection. (*Commonwealth v. Gaynor* (2005) 443 Mass. 245, 266–267 [820 N.E.2d 233]; *Bander, supra*, 208 P.3d 1242; *State v. Whittey* (2003) 149 N.H. 463, 472–473 [821 A.2d 1086].) Defendant offers no authority for his underlying assumption that a lack of national standards for interpreting how high a peak must be on an electropherogram to be sufficient for identification as an allele threatens the basic constitutional rights of a criminal defendant. Any possible constitutional challenge is premature here. The threshold question, preserved below and raised on appeal, is whether the methodology is new and generally accepted.

■ A similar contention was raised in *Reilly, supra*, 196 Cal.App.3d 1127, at least within the context of the expert testimony by a detractor of electrophoretic typing of dried bloodstain evidence. He, like defendant here, lamented the absence of uniform guidelines "to promote 'confidence' " and hence general acceptance among scientists. (*Id.* at p. 1150.) The court rejected the need for uniform guidelines and explained: "The only conflict is that [the detractor] *intractably demands guidelines as quality assurance while his colleagues do not.* Thus, the technique is generally, even overwhelmingly, accepted in the scientific community *without* the guidelines. As [the detractor] concedes, guidelines cannot remove the risk of error altogether. We see no reason to judicially impose a 'guidelines' requirement when the *general* scientific community clearly does not." (*Ibid.*) Similarly, in *Axell, supra*, 235 Cal.App.3d 836, DNA typing using RFLP (restriction fragment length polymorphism) was also generally accepted despite the lack of standards and regulations for forensic laboratories. (*Id.* at p. 857.)

**Established Scientific Technique**: In the absence of any legal or scientific authority that the protocol adopted by the county crime lab constitutes a new scientific technique and, if so, is questioned by the scientific community, we reject defendant's challenge to the criminalist's interpretation of the peak heights reflected on the electropherogram. The cases he cites from across the

country suggest that the county crime lab's protocol of identifying only peaks above 75 RFU's as alleles appears to be within the range of protocols used throughout the country. Moreover, the fact that some laboratories interpret results more conservatively than others does not indicate the absence of general acceptance of a scientific technique. (See, e.g., *U.S. v. Chischilly* (9th Cir. 1994) 30 F.3d 1144, 1154.)

■ There appears to be nothing new or innovative about the criminalist's interpretation of a well-accepted methodology in DNA testing. As our Supreme Court admonished in *People v. Cooper* (1991) 53 Cal.3d 771 [281 Cal.Rptr. 90, 809 P.2d 865], once a new scientific technique becomes generally accepted, a *Kelly* prong-one hearing is not necessary to establish whether each specific methodology employing the technique is also generally accepted. (*Id.* at pp. 812–813.) Rather than quibble over the components of the process or the interpretation of the results, challenges are directed to the weight of the evidence to be determined by the jury and not to its admissibility.

■ As the Attorney General points out, California courts have found that the use of PCR and STR technology has been generally accepted by the scientific community. (*Smith, supra,* 107 Cal.App.4th at p. 665; *Henderson, supra,* 107 Cal.App.4th at pp. 786–787.) In both cases the court refused to undertake a *Kelly* prong-one hearing to determine whether use of the technology in mixed-source cases specifically had been accepted by the scientific community. And in both cases, the courts recognized the additional complications arising from mixed-source samples that might impact on the results' reliability, but concluded that the weaknesses or potential flaws were considerations for the jury in weighing the evidence and determining the accuracy of the results. (*Smith, supra,* 107 Cal.App.4th at pp. 671–672; *Henderson, supra,* 107 Cal.App.4th at p. 788.) These complications did not trigger the need for a *Kelly* evidentiary hearing. (*Ibid.*)

The same is true here. The criminalist testified to no new revolution in science or in probability analysis. Defendant fails, therefore, to meet the very threshold showing that the prosecution is relying on a new scientific technique. Appropriately, the defense seized on the opportunity to vigorously cross-examine the criminalist's methodology and the interpretation of the results. As a result, the jury heard all the evidence and argument as to why dropping peaks below 75 RFU unfairly disfavored defendant and why excluding shared alleles cast doubt on the strength of the resulting profile. Thus, the jurors found themselves in the same shoes worn by jurors in all technical and scientific cases wherein they are asked to determine the weight of the expert testimony in light of its inherent weaknesses or flaws and the specific methodology utilized by the expert in the case before them.

██ We conclude there was no danger here that the jury naively embraced the efficacy of an untested and innovative scientific advance. Because there is no new scientific technique involved, but a mere disagreement as to how well-accepted DNA testing is applied and interpreted, the court did not err by refusing a *Kelly* prong-one hearing. In the absence of a new technique, and not a mere tweaking of existing testing methodologies and calculations, the concerns embodied by the *Kelly* principle are not implicated and the hypothetical constitutional challenges belatedly asserted do not arise.

## DISPOSITION

The judgment is affirmed.

Nicholson, J., and Hull, J., concurred.

Appellant's petition for review by the Supreme Court was denied January 30, 2013, S206840.