Filed 10/7/20  P. v. Barragan CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | G057479 |
| v. | (Super. Ct. No. 16WF0855) |
| ISSAC BARRAGAN, | O P I N I O N |
| Defendant and Appellant. | |

Appeal from a judgment of the Superior Court of Orange County, Lance Jensen, Judge.  Affirmed.

Robert V. Vallandigham, Jr., under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Paul M.

Roadarmel, Jr. and Allison H. Chung, Deputy Attorneys General, for Plaintiff and Respondent.

*       *       *

A jury convicted Issac Barragan[1] of attempted rape, kidnapping to commit rape, and assault with intent to commit rape. Barragan asserts the trial court prejudicially erred by admitting evidence involving inconclusive DNA test results. He also contends his conviction for attempted rape must be reversed because attempted rape is a lesser included offense of assault with intent to commit rape. We reject both contentions and affirm the judgment.

## FACTS

According to the victim, O.A., she was walking alone near a park in Anaheim one evening when she heard footsteps behind her. A man suddenly grabbed her from behind and put his hands over her mouth and across her body. He pushed her up against a parked car and threatened her, "I'll kill you if you say something."

The man then dragged O.A. about 30 to 40 feet into the park to a picnic table.[2] With his hand still over O.A.'s mouth, the man pushed her to the ground facedown, strangled her, and pressed her head against the ground. When O.A. pleaded to be released, he warned, "Don't scream or I'll kill you," and told her to give him what he wanted. The man then removed O.A.'s shorts and underwear and attempted, without success, to insert his penis in her vagina as she struggled against him.

The man stood up for a moment, and O.A. then ran toward the street, leaving behind her shorts, underwear, handbag, and other belongings. The man briefly

---

[1]     Certain parts of the record spell defendant's first name as "Isaac."

[2]     Although O.A. estimated the distance as 30 to 40 feet, the officer who later inspected the scene estimated the picnic table was about 190 feet from the sidewalk.

pursued her, but eventually abandoned the chase. O.A. encountered two women on the sidewalk, and they escorted her to a nearby restaurant where an employee called the police.

Police officers responded, obtained a description of the suspect from O.A., and inspected the area at the park where the attack occurred. One of the officers transported O.A. to a hospital, where a specialized forensic nurse performed a sexual assault exam. During the exam, the nurse collected swab samples from O.A.'s neck, fingernails, outer mouth, thighs, and external genitalia. She also obtained O.A.'s reference sample.

Barragan's buccal swab was submitted for DNA analysis to the Orange County Sheriff's Department DNA Crime Laboratory, along with O.A.'s sample and the swabs collected during O.A.'s sexual assault exam.[3] A forensic scientist then compared portions of Barragan's and O.A.'s DNA profiles to the DNA found in the sample swabs. Although the DNA data from most of the sample swabs was inconclusive and could not be interpreted, the sample taken from O.A.'s neck contained both O.A.'s DNA and foreign DNA that was "consistent" with Barragan's DNA profile.

O.A., who had left the United States shortly after the incident, reviewed a lineup via email. She tentatively identified Barragan as her attacker, adding that she could not "tell for sure."

The Orange County District Attorney filed an information charging Barragan with forcible rape (count 1) (Pen. Code, § 261, subd. (a)(2)), kidnapping to commit a sexual offense (count 2) (*id.*, § 209, subd. (b)(1)), assault with intent to commit a sexual offense (count 3) (*id.*, § 220, subd. (a)(1)), and second-degree robbery (count 4)

---

[3] Barragan's DNA sample apparently came from a database. The trial court was concerned this fact could be prejudicial because it might suggest Barragan had committed a crime in the past, so at trial the jury was informed Barragan's DNA sample was submitted to the lab for analysis and was "obtained following approved procedures."

(*id.*, §§ 211, 212.5, subd. (c)). As to count 1, the information further alleged Barragan kidnapped the victim (*id.*, § 667.61, subds. (b) & (e)).[4] Barragan denied the allegations and pleaded not guilty. Before trial, the court granted Barragan's motion to dismiss count 4.

Before and during trial, Barragan repeatedly objected to the admission of evidence related to the inconclusive DNA test results. We discuss those objections, the evidence, and the trial court's rulings in greater detail below.

On count 1, the jury found Barragan not guilty of forcible rape, but found him guilty of the lesser included offense of attempted rape. The jury also found Barragan guilty on count 2 (kidnapping to commit rape) and count 3 (assault with intent to commit a sexual offense).

The trial court sentenced Barragan to state prison for seven years to life. Barragan appeals from the judgment of conviction.

## DISCUSSION

1.      *The Admission of Inconclusive DNA Data*

Barragan first contends the trial court abused its discretion and committed prejudicial error by admitting evidence related to the inconclusive DNA test results. For the reasons below, we conclude any error was harmless.

Before turning to the merits of Barragan's contentions, in order to put those contentions into proper context, we review the basic mechanics of DNA testing. "DNA, the genetic material found in the nucleus of human cells, 'is organized into 23 pairs of . . . chromosomes, 1 chromosome in each pair being inherited from the mother and the other

---

[4]      The information also alleged the movement of the victim substantially increased the risk of harm to the victim over and above the level of risk necessarily inherent in the offense (Pen. Code, § 667.61, subds. (a) & (d)(2)), but the trial court dismissed that special allegation per the People's request.

from the father.' [Citation.] . . . In most areas of the chromosome, '"the sequence of base pairs is the same for everyone."' [Citation.] In certain locations, however, the sequence varies from person to person. [Citation.] A location—or locus—that is variable is '"polymorphic."' [Citation.] Scientists examining regions known to be polymorphic, '"have identified loci where a particular pattern of base pairs is repeated successively for numbers of times that vary from person to person."' (*People v. Lazarus* (2015) 238 Cal.App.4th 734, 777.) In these so-called short tandem repeat (STR) loci, "[t]he number of repeats at specified locations varies among individuals and becomes the basis for distinguishing between them. Each person's DNA contains two copies of these markers—one copy inherited from the father and one from the mother. Variations between them in the number of repeats are referred to as alleles. Thus, for example, an STR marker inherited from the mother might have 10 repeats while the marker inherited from the father has 15; each marker is an allele." (*People v. Stevey* (2012) 209 Cal.App.4th 1400, 1408 (*Stevey*).)

After select loci in the DNA are amplified, to identify alleles at those loci, "[f]luorescent tags are added to the DNA. The sample is run through an instrument that produces an electropherogram. An electropherogram produces a graphical representation of the DNA, including the number of repeats in STR alleles. Electropherograms, produced during typing, display peaks. The higher the peak, the more DNA is present at a specific location. The height of the peaks is measured as relative fluorescence units (RFU). If the peak reaches a certain height, the criminalist identifies it as an allele with a numerical designation indicating the number of repeats. The peaks on the electropherogram represent an allele." (*Stevey, supra,* 209 Cal.App.4th at pp. 1408-1409.) The criminalist then measures and compares the alleles at each locus to determine whether DNA found in a sample swab matches a suspect's DNA. (*Lazarus, supra,* 238 Cal.App.4th at p. 778.)

Importantly, "[l]abs set protocols to ensure the integrity of the DNA profile. . . . [I]n a sample there are real peaks representing alleles, but there may also be noise from the electricity used in producing the electropherogram and artifacts, that is, miscellaneous matter that is not DNA. If, therefore, the height of a peak is below [a particular] RFU, the protocol of the county crime lab is to not identify the peak as an allele. The peaks below [that cutoff] might represent a very low amount of DNA, or they might represent noise or artifacts." (*Stevey, supra,* 209 Cal.App.4th at p. 1409.)

As noted above, during the sexual assault examination of O.A. after the attack, a qualified forensic nurse collected swab samples from O.A.'s neck, fingernails, outer mouth, thighs, and genitalia. Using Barragan's and O.A.'s DNA samples, the Orange County Sherriff's Department DNA Crime Laboratory created DNA profiles for both Barragan and O.A. by targeting 15 loci. A forensic scientist then evaluated which alleles were present at each of those 15 loci. To do so, she used an electropherogram, or a graphical representation of the DNA, and identified peaks in the results.

According to laboratory standards for the particular DNA testing kit used here, each peak on the electropherogram must have a value of *at least 300 RFUs* in order for an allele to be identified. If a given peak does not meet that threshold, that means there is insufficient DNA present in the sample, and the data cannot be interpreted. As the forensic scientist explained, when there is a low peak, "we don't report it [as an allele] because we don't have any confidence that it would truly be a DNA peak."

Using the electropherogram, the forensic scientist compared Barragan's and O.A.'s respective alleles at each locus to the alleles found in the samples taken during O.A.'s sexual assault exam. She determined the DNA sample from the neck swab contained foreign DNA that was "consistent" with Barragan's DNA profile. According to the forensic scientist, the statistical rarity of the foreign contributor's DNA profile was one in a trillion. She was unable to interpret the DNA data from most of the other sample swabs because the electropherogram peaks corresponding to those swabs were too low.

6

At trial, the prosecution used a table entitled "Report of Evidence Examination and DNA Typing" (People's Exhibit 24) when questioning the forensic scientist on her DNA analysis. The table, which for the most part is typed, lists the two alleles detected at each of 15 loci from O.A.'s reference sample, the two alleles detected at each of the 15 loci from Barragan's DNA sample, and the alleles detected (if any) at each of the 15 loci from each of the sexual assault exam samples (i.e., the neck sample, the thigh samples, the mouth sample, and the fingernail sample). These numbers illustrate which, if any, of the sexual assault example samples are consistent with either O.A.'s or Barragan's DNA. For example, looking at the D8S1179 gene (one of the loci tested), the table shows O.A.'s alleles are 13 and 14, Barragan's are 11 and 12, and the alleles found in the neck sample are 11, 12, 13, and 14 (which is consistent with the prosecution's theory that the neck swab sample contained *both* O.A.'s DNA *and* Barragan's DNA). Likewise, for the D21S11 gene, O.A.'s alleles are 31 and 35, Barragan's are 29 and 30, and the alleles found in the neck sample are 29, 30, 31, and 35 (again consistent with the prosecution's argument). All of the typed allele numbers in the table are based on electropherogram peaks of at least 300 RFUs.

Barragan's evidentiary objection stems from the fact that Exhibit 24 also included certain handwritten numbers identifying supposed "alleles" that were calculated based on electropherogram peaks lower than 300 RFUs. As noted above, the forensic scientist testified that the DNA pulled from the thigh, mouth, and fingernail samples could not be interpreted because the values for those samples on the electropherogram were under 300 RFUs and thus were not reportable under the applicable laboratory standards for the particular DNA testing kit used here. According to the forensic scientist, those handwritten numbers were pulled from the electropherogram and added to the table, even though their values did not meet the 300 RFU threshold and thus were too low to be interpreted under the lab's standards for this particular DNA testing kit. Despite her admitted inability to interpret the alleles from those samples due to insufficient data,

7

Exhibit 24 included handwritten numbers identifying supposed alleles calculated using unreliable data.

For example, the column in Exhibit 24 regarding the TPOX gene (one of the loci tested) lists O.A.'s alleles for that gene as "6, 9," lists Barragan's alleles as "8, 10," lists the neck swab sample alleles as "6, 9, 8, 10" (which is consistent with the neck swab sample containing both O.A.'s DNA and Barragan's DNA), and lists the left anterior thigh sample as "NR" (i.e., not reportable). Then, underneath the "NR" appear the numbers "8*, 10*," written by hand. If credited, these handwritten numbers arguably suggest the anterior thigh sample contained DNA consistent with Barragan's DNA profile.

Before and during trial, and again at the exhibits admission conference, Barragan's counsel asked the trial court to exclude or redact those handwritten figures, asserting the jury should only hear about the neck sample, which showed a DNA profile that was consistent with Barragan. Defense counsel expressed concern that jurors would assume, based on the handwritten data on the chart, that Barragan's DNA was present on the remaining samples, when in fact the data from those samples was insufficient and could not be interpreted. The court overruled Barragan's objections, noting the People could use the chart to explain "why the non-hit material never rose to a level of being a hit."

Barragan contends this was error. According to Barragan, since the challenged DNA data fell below the relevant scientific standard applied by the crime lab, it had no probative value, and a lay juror would have no basis on which to interpret such technical evidence. Barragan further asserts the handwritten numbers suggested there was additional DNA evidence tying Barragan to the mixed DNA sample taken from the victim's neck and that evidence should be used by the jury to convict.

The People assert the inconclusive DNA results were relevant to provide context for what DNA testing was performed. According to the People, it would have

8

been inappropriate to inform the jury that swabs from O.A.'s fingernails, outer mouth, and thighs were collected and tested, but to withhold the results of those tests. The People further contend the inconclusiveness of the data went to the probative weight of the evidence, not whether the evidence met the threshold requirement of relevancy.

"'We review a trial court's decision to admit or exclude evidence "for abuse of discretion, and [the ruling] will not be disturbed unless there is a showing that the trial court acted in an arbitrary, capricious, or absurd manner resulting in a miscarriage of justice.'"" (*People v. Young* (2019) 7 Cal.5th 905, 931 (*Young*).) Even if the "'evidence is erroneously admitted, we do not reverse a conviction unless it is reasonably probable that a result more favorable to the defendant would have occurred absent the error.'" (*Ibid.*; see *People v. Watson* (1956) 46 Cal.2d 818, 836.)

California courts have not yet addressed the precise evidentiary issue presented here, so we default to the familiar rules on the admissibility of evidence. All relevant evidence is admissible except as otherwise provided by statute. (Evid. Code, § 351.) "'Relevant evidence' means evidence, including evidence relevant to the credibility of a witness or hearsay declarant, having any tendency in reason to prove or disprove any disputed fact that is of consequence to the determination of the action." (*Id.*, § 210.) "The court in its discretion may exclude evidence if its probative value is substantially outweighed by the probability that its admission will (a) necessitate undue consumption of time or (b) create substantial danger of undue prejudice, of confusing the issues, or of misleading the jury." (*Id.*, § 352.)

We have some concerns about the admission of the handwritten numbers on Exhibit 24. Inconclusive test results can be relevant. (See, e.g., *People v. Horning* (2004) 34 Cal.4th 871, 900 [inconclusive opinion asserting degraded bullets "could have been" fired from a gun barrel associated with the defendant "was relevant for the jury to learn that the evidence was tested, and that similarities . . . showed that both bullets might have been fired from the barrel, but that it was impossible to say for sure"]; *People v.*

9

*Cooper* (1991) 53 Cal.3d 771, 813 [relevant for the jury to learn that two cigarette butts found in the victims' car were tested scientifically even though the results were inconclusive].) But the testimony of the People's own expert causes us to question whether the handwritten figures based on the low peaks on the electropherogram had any tendency to prove a disputed fact. The forensic scientist testified her laboratory's protocols barred her from considering those numbers in interpreting the DNA evidence, and she did not "have any confidence" they were based on actual DNA. (See also *Stevey*, *supra*, 209 Cal.App.4th at p. 1409 (italics added) [low peaks "might represent a very low amount of DNA, *or* they might represent noise" from the electricity used in producing the electropherogram].) Suffice it to say this is a complicated and highly technical issue,[5] and the People's arguments are anything but technical.

The People claim the handwritten data was relevant to explain the forensic scientist's methodology. We are not persuaded. She could have explained her process without referencing the handwritten numbers on Exhibit 24. The typed results on Exhibit 24, including the "NR" notation where the electropherogram peaks did not reach the requisite RFU threshold, would have been more than adequate. Thus, even if the fact that O.A.'s fingernails, outer mouth, and thighs were tested was relevant, Exhibit 24

---

[5] For example, as the Washington Court of Appeals explained: "Two other related phenomena that can complicate the interpretation of DNA mixtures are stutter and allelic dropout. A 'stutter' is an allelic artifact resulting from slippage of the Taq polymerase enzyme during electrophoresis. It appears on the electropherogram as a smaller peak immediately preceding the peak representing the detected allele. Although scientists have settled on criteria that make identification of stutters straightforward in single-source samples, in a mixed sample, a stutter peak might be confused for a minor allele. [Citations.] [¶] 'Allelic dropout' occurs when an allele is not detected above the reporting threshold. [Citation.] Sample degradation, very low levels of DNA, and problems during the amplification process can result in dim fluorescence during electrophoresis so that an allele's RFU measurement falls below the reporting threshold or, in some instances, even below the detection threshold. [Citation.] In mixed-source samples, it may be difficult to distinguish minor alleles from stutters and dropouts." (*State v. Bander* (2009) 150 Wash.App. 690, 704.)

should not have included the handwritten figures that did not pass the laboratory's own standards for reliability.

Ultimately, however, we need not resolve whether the trial court erred in admitting the handwritten figures, because any error was harmless. As noted, "'we do not reverse a conviction unless it is reasonably probable that a result more favorable to the defendant would have occurred absent the error.'" (*Young, supra*, 7 Cal.5th at p. 931.) Here, other DNA evidence—namely, the neck sample with its "one in a trillion" likelihood of a match to Barragan—strongly established he was O.A.'s attacker. (See *People v. Vargas* (2009) 178 Cal.App.4th 647, 662-663 [error in admitting statements was harmless given incontrovertible DNA evidence the defendant had sexual intercourse with the victim].) Further, the forensic expert's testimony regarding the chart with the handwritten notes was relatively brief, as was the prosecutor's reference to them during closing arguments. Thus, even if the trial court erred in admitting the challenged evidence, there is no reasonable likelihood the outcome of the case would have been different had it been excluded.

### 2. *Attempted Rape as a Lesser Included Offense*

Barragan next contends his conviction of attempted rape (count 1) must be reversed as a lesser included offense of assault with intent to commit rape (count 3). The People concede a defendant cannot be convicted of both assault with intent to commit rape and attempted rape arising from the *same* conduct, but argue Barragan was properly convicted on both counts because they were not based on the same acts. We agree.

California law generally allows a person to be convicted of multiple crimes arising from a single act or course of conduct, but a judicially created exception "'prohibits multiple convictions based on necessarily included offenses.'" (Pen. Code, § 954; *People v. Reed* (2006) 38 Cal.4th 1224, 1227.) Stated differently, "[t]he law prohibits simultaneous convictions for both a greater offense and a lesser offense

11

necessarily included within it, when based on the same conduct." (*People v. Milward* (2011) 52 Cal.4th 580, 589.)

When the multiple convictions are for crimes arising from *separate* acts, however, there is no violation of Penal Code section 954. (See *People v. Greer* (1947) 30 Cal.2d 589, 600, overruled on other grounds in *People v. Fields* (1996) 13 Cal.4th 289, 308, fn. 6.) Thus, even if one charged offense is necessarily included in another offense, a defendant can be convicted of both offenses "if separate acts served as the basis of each count." (*Ibid.*)

Barragan committed two separate acts. As the trial testimony and the prosecutor's closing argument make clear, the offense of assault with intent to commit rape was based on Barragan's conduct before he tried to achieve penetration: his acts of grabbing O.A. from behind, pushing her against the parked car, placing his hands over her mouth and across her body, dragging her from the street into the park, pushing her to the ground, strangling her, pressing her head against the ground, and removing her clothes. In contrast, the offense of attempted rape was based on Barragan's unsuccessful attempts to insert his penis in O.A.'s vagina.[6]

The assault with intent to commit rape involved separate and divisible conduct from the attempted rape. Since Barragan's convictions were not based on the same conduct, Barragan was properly convicted on both counts.

---

[6] During closing argument, the prosecutor argued Barragan was guilty of assault with intent to commit rape based on "the actions that happen prior to the actual rape. The rape is when he passes the labia. Everything up until then is assault with intent to commit rape. So that's when he moves her off the street, that's enough to be assault with intent to commit rape. When he pushes her down, when he pulls off her underwear, all of those actions are sufficient."

**DISPOSITION**

The judgment is affirmed.

GOETHALS, J.

WE CONCUR:

ARONSON, ACTING P. J.

FYBEL, J.